**PETTY et al. v. HUNTER.**

No. 3055.

Court of Civil Appeals of Texas. Waco.

Jan. 15, 1953.

Rehearing Denied Feb. 13, 1953.

544

Robert G. Carter, Marlin, for appellants.

Bartlett & Bartlett, Marlin, for appellee.

TIREY, Justice.

Dr. Hunter, appellee here, brought this suit against Bernice Petty and her husband for medical services he alleged he rendered to Bernice Petty for a period of time beginning August 31, 1950 and ending April 4, 1951, and alleged the reasonable value of the services to be $250. He also sought to recover for hospital care furnished to Bernice Petty for the period of 221 days at $6 per day for the above period of time, and alleged that such charge was reasonable.

Appellants sought to defeat appellee's claim for medical services and hospitalization on the ground that after she entered plaintiff's hospital for medical services and hospitalization that she completely recovered in about two weeks and then appellants and appellee entered into an agreement whereby Bernice Petty would remain in the hospital of appellee in order to make it appear to the Santa Fe Railroad Company, against whom appellants were asserting a claim for personal injuries, that Bernice Petty's injuries were much more serious than they actually were and thereby enable her to recover a much larger sum for compensation for personal injuries and for doctor's bills and for hospitalization; that pursuant to said agreement

Bernice Petty did remain in the hospital of appellee approximately seven months and that in so doing she worked as a nurse for about two months and kept books without compensation in order to pass away the time while awaiting settlement with the Railroad Company.

The court overruled appellants' request for an instructed verdict and the jury in its verdict found substantially that Dr. Hunter rendered medical services to Bernice Petty and that the reasonable value of the medical services so rendered was $250; that plaintiff furnished Bernice Petty hospital care and that the reasonable value of the hospital care furnished to her was $500. The jury further found that Bernice Petty remained in plaintiff's hospital after she recovered from her injuries for the purpose of obtaining money from the Santa Fe Railroad Company to which she was not entitled. The jury further found that Dr. Hunter and Bernice Petty did not agree that he would receive as compensation for medical care and hospitalization all of the money which Bernice Petty recovered for medical care and hospitalization in her suit against the Railroad Company. Dr. Hunter seasonably filed motion for judgment non obstante veredicto and in this motion he asked that the court disregard the finding of the jury to Special Issue No. 4, which answer was that the hospital care furnished to Bernice Petty amounted to $500, and that he have judgment after such finding is disregarded in the sum of $1376, together with interest and costs. The appellants seasonably filed their motion for judgment non obstante veredicto on the ground that Dr. Hunter had entered into a fraudulent scheme with the appellants to make use of his hospital and his medical services for the purpose of defrauding the Santa Fe Railroad Company, and that such conduct on the part of Dr. Hunter was illegal and against public policy and should not be enforced by the court. The court overruled appellants' motion for judgment and granted appellee's motion for judgment, and awarded to Dr. Hunter the sum of $1326, jointly and severally, against Bernice Petty and her husband, Ernest Petty, Jr. The decree further provided that the Marlin

National Bank, garnishee, be allowed an attorney's fee in the amount of $50, together with its costs in this behalf. Appellants seasonably perfected their appeal to this court.

Appellants' first point is: "The Court erred in overruling defendant's motion for judgment non obstante veredicto because the uncontradicted evidence showed that the agreement between plaintiff and defendants was void as against public policy in that it was made for the purpose of defrauding the Santa Fe Railroad." A statement is necessary.

Dr. Hunter testified in part as follows:

"Q. Do you feel it was necessary for her to be in that hospital seven months for treatment? A. I didn't keep her there seven months for treatment.

"Q. What was she doing in there? A. Judge, you will have to get me straight. They want me to know what she was doing. Do you want me to tell it here?

"Q. Tell it. A. They entered into an agreement with some lawyer in Waco to get $50,000.00 or more. I had nothing to do with that settlement. O'Dowd and O'Dowd, the lawyers out of Waco came to me telling me to let her stay. 'We are going to get a big fee. Whatever we get out of that, we are going to pay the hospital fee. Don't worry.' I couldn't put her out. She stayed and she stayed, until the Santa Fe lawyer, Mr. Howell from Waco, came down and asked me to give an affidavit or statement. We went over her case. I tried to tell the truth, because I don't make nothing lying. Now they claim my telling the truth kept them from getting $50,000.00. If the truth kept them from getting $50,000.00, it wasn't my fault. They promised to pay me my fee out of whatever they got. After Mr. Howell came down and made arrangements for an ambulance to carry her to Waco they carried her to the hospital—I don't know which one—carried her through

and took x-rays and things like that, the railroad company said they were through. I had no other recourses for somebody to pay me my fee."

Dr. Hunter further testified to the effect that Bernice Petty came to his hospital on August 31, 1950, and that she was there for a period of 221 days; that during that time her wounds were treated and she was treated for nervousness and "the nurse gave her whatever medicine she wanted, the woman in the bath room gave her the baths for muscle soreness, and I gave the penicillin to the nurse"; that such treatments were given under his direction. Appellee testified: "I only charged her $250.00 for 221 days. She was there and I looked at her and gave her whatever she needed and wanted." That she paid to him the sum of $200 from the amount which she got from the Reliable Life Insurance Company. He further testified:

"Q. When was the first time you knew O'Dowd and O'Dowd were working for Bernice Petty? A. They told me about it, that they were there that night, the next day I think. When they first came, I didn't see them.

"Q. Did you ever tell anybody you were going to get your money out of the railroad? A. The claim agent from Temple, I don't recall his name, said, 'It is not from the railroad company directly, but the way they settle, the way I understand it, it comes out of whatever your patient gets.'

"Q. In other words you never did tell anybody you expected to get your money out of the railroad company? A. I expected to get it out of whatever fee the railroad company paid the patient. That is the way I have always done business with them. The patient never has paid separate. Whatever they get out of the company, my fee is included in that judgment.

* * * * * *

"Q. You said after they took your deposition they claimed you didn't do what you were supposed to. A. I said the Pettys and their lawyer they

had employed, they wanted me to tell something that I wasn't going to tell. I told the truth as I knew it.

"Q. Did you tell him she wouldn't be able to work again? A. I didn't tell him that, I don't think—I may have. I don't recall off hand.

\*  \*  \*  \*  \*  \*

"Q. You made this statement to the railroad agent, 'I am a practicing physician and surgeon and operate the Hunter Clinic, of Marlin, Texas. Mrs. Bernice Petty is a patient of this institution and entered the clinic on August 31, 1950 of this year for treatment of injuries sustained in a passenger train derailment near Lometa, Texas. I found her suffering from general muscular soreness all over her body and evidence of bruising on her left arm and about her legs. She was also complaining of her back and headaches, which I concluded was due to secondary shock and general nervous tension. We accepted the reports of the Santa Fe Hospital that there was no fractures revealed by the x-ray and I found no symptoms or circumstances suggesting a fracture. She is making a satisfactory recovery but is not well yet. She is still confined in the hospital. She is a very heavy woman, weighing around 230 pounds, and which fact retards normal recovery. There is no finding that there are any permanent injury and all of them should completely get well but it may be about two more weeks before she would be able to be dismissed from the hospital. As stated her recovery is satisfactory and gradual. At this time, I estimate a hospital bill of approximately $250.00, covering hospital room, medicines, and professional care. At this time, I do not anticipate any development in this patient's condition calculated to further delay a complete recovery.' Was that the statement you gave them October 4, 1950? A. Yes. \* \* \*

"Q. Then it is your testimony now that you are looking to Bernice Petty for your money, and not the railroad?

A. Whatever money the railroad company paid in the settlement of that claim, my hospital fee and the court fee was to be included in that bill.

"Q. That is right. Then the railroad owed you? A. Bernice made the contract. My name was on the back when it came from Waco from her lawyer. The check was made out to me and her. They came to me and had me indorse the check. The bank sent it through regular collection. They agreed to pay me my fee and leave my money in the bank. A day or two later I went to the bank and asked if there was any money left there for me. They said no, and asked me what it was; I told them. They said there wasn't nothing left for me. I sent to her after my money and she said she wasn't sending me nothing. I went to the bank and garnisheed her bank account."

As we have heretofore pointed out, the jury in its verdict found that Bernice Petty remained in appellee's hospital after she had recovered from her injuries, for the purpose of obtaining money from the Santa Fe Railroad Company to which she was not entitled. As we understand the record, it is without dispute that Dr. Hunter knew that Bernice Petty was remaining in the hospital at the request of her lawyers O'Dowd & O'Dowd, who were representing her in her claim against the railroad, for the purpose of obtaining a large sum of money from the railroad, to-wit, $50,000, and that Dr. Hunter expected to be paid out of such funds received for his medical fees and hospital bills.

Our Supreme Court in Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146, cites and reviews many of the leading cases in Texas dealing with rights of parties to a contract or to a transaction illegal in part. In this opinion our Supreme Court quotes from the opinion of Wiggins v. Bisso, 92 Tex. 219, 47 S.W. 637, wherein the Supreme Court said: " 'There can be no doubt that where the parties have jointly, in the pursuit of an illegal purpose, acquired money, and invested that money in property which is in the possession of one of the joint

owners, such possessor cannot resist the claim of the other on the ground of the illegality of the business in which the money was first acquired. It was not necessary for plaintiff to prove the partnership, because the cotton was bought for the firm not in the course of the unlawful business.' Recovery of his share of the profits was denied to the plaintiff in the Wiggins case, in which the partnership had been formed for the express and sole purpose of making and carrying out a contract between the partnership and another association, which in its terms was a distinct violation of the anti-trust law of the state. The suit was for a division of the profits from the unlawful contract which were in the possession of one of the partners and had not been invested in other property." [145 Tex. 468, 199 S.W.2d 150.]

It is our view that the doctor's bills and hospital bills incurred by the Pettys subsequent to the time she had recovered come squarely within the rule announced in Wiggins v. Bisso, supra. Appellants have received all of the money that Bernice Petty was to receive from the Railroad Company by reason of her alleged injury. The Railroad Company had paid to her and to her attorneys, O'Dowd & O'Dowd, the sum of $3500, and the firm of O'Dowd & O'Dowd had obtained the necessary endorsements on the voucher issued and delivered by the Railroad Company in payment of the agreed settlement, and they in turn had issued their check to appellant and her husband and appellee, Dr. Hunter, for the remainder of the $3500, after deducting their fee, and Dr. Hunter had endorsed the check that the O'Dowds had sent to Bernice Petty and her husband, and Bernice Petty and her husband had taken the check and deposited the money in one of the Marlin banks and had refused to pay any part of the proceeds to Dr. Hunter in payment of doctor's bills and hospitalization. It is our view that this undisputed factual situation brings Dr. Hunter's claim, in part, within the general rule that denies relief to a party to an illegal contract, as is expressed in the maxim: In pari delicto, potior est conditio defendentis. "The court will not permit 'its ermine to be soiled by the touch of fraud;' and neither law nor equity will afford relief to one participating in a fraudulent transaction. The parties to such a transaction will be left where they placed themselves." Prude v. Campbell, 85 Tex. 4, 19 S.W. 890, 892. Under the record here made it appears that Bernice Petty was accidentally injured to some extent while a passenger on the Santa Fe train sometime in the month of August, but the exact date is not given. It also appears that she was in the railroad hospital at Temple for some twenty-four hours and was discharged and that after her discharge from the hospital at Temple she entered appellee's hospital at Marlin on the 31st of August, 1950, and that she was a patient in the hospital at the time she and her husband entered into the agreement with the O'Dowds, but the exact length of time she had been in the hospital when the O'Dowds came to see her is not shown. Under the finding made by the jury there is no way to tell how much of the medical services and hospital service was reasonably and necessarily incurred. It is obvious that Dr. Hunter would be entitled to recover for such medical service and hospital bills as Bernice Petty reasonably and necessarily incurred in his hospital, assuming without deciding that a part of his services and hospitalization for Bernice Petty is not tainted with fraud. We think it is obvious from the record that a part of the medical services rendered and the hospitalization furnished was tainted with fraud and Dr. Hunter did not make his proof for such services without showing such fraudulent scheme. Kokernot v. Gilstrap, 143 Tex. 595, 187 S.W.2d 368. "The test of whether a demand connected with an illegal transaction may be enforced at law is whether or not a case may be established without reliance on the illegal transaction." Pioneer Mutual Compensation Co. v. Diaz, 142 Tex. 184, 177 S.W.2d 202, point 1, page 203.

Since the jury found in answer to Special Issue No. 5 that Bernice Petty remained in Dr. Hunter's hospital after she had recovered from her injuries for the purpose of obtaining money from the Santa

Fe Railroad Company to which she was not entitled, we feel that the ends of justice require us to reverse and remand the cause rather than reverse and render.

Accordingly, the judgment of the trial court is reversed and the cause is remanded.

McDONALD, C. J., took no part in the consideration and disposition of this case.